IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARTHUR LAMONT HENDERSON, LD-3209,   )
     Petitioner,   )
       )
        v.   )    2:18-cv-666
       )
SUPT. CAPOZZA, et al.,   )
     Respondents.   )

MEMORANDUM OPINION and ORDER

Arthur Lamont Henderson, an inmate at the State Correctional Institution-Fayette has presented a petition for a writ of habeas corpus (ECF No. 1). For the reasons set forth below, the petition will be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

Henderson is presently serving a sixty-one to one-hundred-twenty-two year sentence imposed following his multiple convictions by a jury of rape, involuntary deviate sexual intercourse, aggravated indecent assault, statutory sexual assault, indecent assault, robbery, burglary, possession of a firearm by a prohibited person, possession of an instrument of crime, false imprisonment, unlawful restraint, terroristic threats, theft by unlawful taking, receiving stolen property, intimidation of a victim or witness, unlawful use of an access device and recklessly endangering another person at Nos. CP-02-CR-1873 and 1874-2012 in the Court of Common Pleas of Allegheny County, Pennsylvania. This sentence was imposed on March 26, 2013.[1]

An appeal was taken to the Superior Court in which the issues presented were:

> I. Did the trial court err in denying Mr. Henderson's motion to suppress where, if all deliberate and material omissions and misstatements were properly extracted, the four corners of the affidavit failed to establish probable cause to justify the search and seizure of Mr. Henderson's DNA and personal belongings?
>
> II. Did the trial court violate Mr. Henderson' constitution rights to self-representation, due process, and a fair trial when it forced Mr.

---

[1] See: Petition at ¶¶ 1-6 and Answer at pp.1-6.

Henderson, who proceeded *pro se* to remain seated at the defense table at all times throughout the course of trial?

III. Did the trial court violate Mr. Henderson's constitutional right to assistance of counsel by refusing to appoint him new trial counsel even through Mr. Henderson's trial counsel refused to subpoena and call critical witnesses, was unprepared for trial, and there was nothing to support the trial court's belief that Mr. Henderson sought new counsel merely to delay trial?

IV. Did trial court abuse its discretion in refusing to appoint Mr. Henderson new trial counsel where that decision was influenced by the court's partiality towards the Commonwealth?

V. Did the trial court violate Mr. Henderson's constitutional right to assistance of counsel at sentencing where Mr. Henderson specifically requested to be represented by counsel and never waived this right?

VI. Did the trial court abuse its discretion by not allowing Mr. Henderson to present video surveillance footage of himself at the Meadows Casino on January 9, 2012, where that evidence was both relevant and critical to Mr. Henderson's defense?

VII. Did trial court abuse its discretion by sentencing Mr. Henderson to a manifestly unreasonable and excessive sentence of incarceration where the court failed to abide by the mandates of 42 Pa.C.S. § 9721(b), which requires the court to consider the recommended sentencing guidelines at the sentencing hearing?[2]

On December 23, 2014, the judgment of sentence was affirmed and leave to appeal to the Pennsylvania Supreme Court was denied on November 4, 2015.[3]

Henderson filed a post-conviction petition which was dismissed on January 6, 2017.[4] A *pro se* appeal was filed in the Superior Court in which the issues presented were:

I. Did PCRA court err when failing to address amended claim of government interference related to petitioner's PCRA petition filed with court of records when petitioner complained of transcripts missing and replaced from Exhibit B2 related to Issue IV of partiality towards the Commonwealth claim in PCRA petition and petition was never scanned or hard copy available in court of records?

---

[2] See: Respondents' Exhibits at pp.280-281.
[3] Id. at pp. 502-528, 609.
[4] Id. at pp. 765-766.

II. Did the PCRA court abuse its discretion and err when failing to transmit appellant's original certified PCRA petition?

III. Did PCRA court abuse its discretion when denying petitioner's motion to recuse/disqualification allowing the court's bias/prejudice to influence outcome of PCRA action. Judge Donna Jo McDaniel who is named in an action where the probability of actual bias on the part of the judge is subjective and will affect a neutral two-part irreconcilable role as an accused and the deciding authority?

IV. Did PCRA court abuse its discretion and err when not addressing Issue IV in petitioner's PCRA petition where petitioner was denied new trial counsel due to partiality towards the Commonwealth when issue was properly preserved and presented to PCRA court and where merits of issue has never been adjudicated?

V. Did PCRA court err when not addressing amended claim of obvious or structural error in petitioner's response to intent to dismiss motion of ex-parte conversation at petitioner's waiver of counsel colloquy proceedings?

VI. Did PCRA court abuse its discretion and err when failing to follow Turner/Finley procedure allowing counsel to withdraw and dismissing PCRA petition when counsel failed to address Issue IV of partiality towards the Commonwealth in PCRA petition?

VII. Did PCRA court err when failing to address amended claim of conflict of interest in petitioner's response to intent to dismiss when conflict of public defender's office denied petitioner of appellate review on direct appeal due to defective brief filed by appellant counsel from public defender's office?

VIII. Did PCRA counsel err and abuse its discretion by failing to find pre-trial counsel ineffective for failing to conduct a meaningful pre-trial investigation, to fully pursue discovery, and by failing to object to Brady violation?

IX. Did PCRA court err and abuse its discretion by failing to find stand-by counsel ineffective for preventing petitioner from conducting his own defense, participating in ex-parte conversations without informing pro se defendant and making critical decisions without petitioner's knowledge?

X. Did PCRA court err and abuse its discretion by failing to find appellate counsel ineffective for filing defective brief on direct appeal which denied petitioner appellate review on an issue properly

preserved for appellate review and for failure to raise obvious or structural errors on appeal under separate headings?

XI. Did PCRA court err and abuse its discretion by failing to find PCRA counsel ineffective for failing to thoroughly investigate petitioner's issues on their merits, failure to address Issue IV in PCRA petition violating Turner/Finley procedure, and failure to recognize constitutional violations of petitioner's rights and revoking constitutional violations of petitioner's rights and revoking petitioner's right to appointed PCRA representation on first collateral review violating Rule 904(c) of the Pennsylvania Rules of Criminal Procedure?[5]

On February 5, 2018 the denial of post-conviction relief was affirmed.[6]

On May 21, 2018, Henderson filed the present petition for a writ of habeas corpus[7] in which he raises the following issues:

1. Petitioner's 4th Amendment right of the United States Constitution has been violated by trial court and Superior Court when four corners of the affidavit [for search warrant] failed to established probable cause to justify search and seizure.

2. Petitioner's Sixth and Fourteenth Amendment rights to counsel and a fair trial under the United States Constitution ha[ve] been violated by the trial court and Superior Court when refusing to appoint new trial counsel and forcing petitioner to represent himself.

3. Petitioner's 5th, 6th and 14th Amendment rights to the United States Constitution ha[ve] been violated by trial court and Superior Court when refusing to appoint new trial counsel where that decision was influenced by trial court's partiality towards the Commonwealth.

4. Petitioner's 6th and 14th Amendment rights to self-representation due process and a fair trial under the United States Constitution ha[ve] been violated by trial court and Superior Court when it forced petitioner who proceeded pro se to remain seated at defense table at all times throughout entire trial.

[5] Id. at pp. 812-813.
[6] Id. at pp. 949-969.
[7] The Commonwealth concedes that the instant petition is timely at p.26 of its answer.

The background to this prosecution is set forth in the January 6, 2017 Opinion of the post-conviction court:

> The Defendant was charged with a total of 53 counts[1] in relation to the sexual assaults of three (3) women on January 7 and 9, 2012…
>
> The evidence presented at trial established that on January 6, 2012, Marilyn Early was celebrating her 50th birthday with friends. The group had dinner and then went to the Rivers Casino in downtown Pittsburgh to gamble. After the party broke up, Early returned to her townhouse in Hempfield Township, Beaver County at approximately 2:30 a.m. on January 7th. She was not ready to end her evening, however, so she changed into jeans and a sweatshirt and drove to the Meadows Casino approximately 45 minutes away, where she played the rest of the night. When Early left the casino just after 7 a.m., surveillance video revealed that she was followed out of the garage by a dark blue Ford Expedition with a brake light out and driver's side damage driven by the Defendant. Early arrived home at approximately 7:45a.m. to take her fiancée's son to school; however, the teenager was still asleep on her living room couch. Without waking him, Early went up the stairs to her bedroom to change. She heard a noise behind her and turned to find a man dressed in black clothing, wearing a black ski mask, hat, sunglasses, gloves and boots, and holding a gun coming up her stairs. The man told her to be quiet and he would not hurt her, and then demanded money. Early gave him $10 - all the money she had in her purse - and a silver bracelet and the man told her to take her clothes off. He positioned her in a kneeling position on the bed and penetrated her vagina with his penis from behind. He then turned her over and forced her to take his penis in her mouth, then re-positioned her in the kneeling position and again penetrated her vaginally. He allowed Early to get dressed, then put her in the bathroom and told her not to come out for 15 minutes. She waited a few minutes, and when she came out of the bathroom, the man was gone. She ran out of the house and drove to the Moon Township Police Department, as she was new to the Hempfield area and didn't know where their Police Department was located. She was transported to Sewickley Hospital where a rape kit examination was performed.
>
> Later that morning, at 9:00 a.m., Angela Asta was taking her dog and her friend's dog for whom she was dog-sitting for a walk outside of her apartment at the Woodhawk Club Apartments in Ross Township. On her way out of her apartment, she noticed a man dressed all in black, wearing a mask and carrying a box outside of her building. Thinking he was a delivery man, she said hello and proceeded on her usual half-mile walk around her neighborhood. When Asta returned to her apartment approximately 15 minutes later, she noticed the same man on the landing near her apartment. She brought the dogs into her apartment and then began to close the door when she felt resistance on it and saw the masked man from the hallway attempting to push

in behind her. She screamed and tried to push the door closed, but the man pointed a gun at her and she backed up. The man came into the apartment and told her to lock up her dogs. He followed her while she put one dog in the bathroom and one in the bedroom. Then in a calm voice, the man demanded money. Asta had $60 or $80 in her wallet and she gave it to him, and he also took two debit cards and one credit card from her. He then made her take off her clothes and while she was naked, he made her write down the PIN numbers for the cards. The man asked Asta if she had condoms or saran wrap and she replied that she did not. He then positioned Asta behind a chair, touched her vagina with his fingers and then penetrated her vagina with his penis. He then re-positioned her on an ottoman and again penetrated her vaginally with his penis. After he was done, he made her lay on the floor and bound her ankles and hands tightly with tape he got from the box he had been carrying, asked her again for the PIN numbers for her cards, took her cell phone and left the apartment. After some time, Asta was eventually able to work herself free from the tape and she ran to her next-door neighbor's for help. The police called and Asta was transported to UPMC Passavant Hospital, where a rape kit examination was performed.

Sometime between 9:45 and 10:00 a.m. on that same morning, Woodhawk Club resident Jennifer Mamaux was outside walking her dog when she observed a black man with an uncovered face wearing a dark zippered hoodie and a black hat jogging from Asta's building to the parking lot. He looked over his shoulder several times as if to see if he was being followed. Shortly thereafter, the man drove by Mamaux on his way out of the complex in a dark blue Ford Expedition with damage to the drivers' side. When Mamaux saw police cars, fire trucks and television news crews appearing soon after, she realized that she may have seen something important and called the Ross Township Police Department with what she had seen.

Using Mamaux's description, Ross Township Police were able to use tapes from the traffic cameras on McKnight Road to locate the vehicle exiting the Woodhawk Club complex immediately after Asta's rape and driving down McKnight road towards downtown Pittsburgh. Shortly thereafter, Asta's debit and credit cards were used by a man wearing a hoodie at an ATM in the Manchester section of the North Side of the City of Pittsburgh. The ATM surveillance camera also picked up a dark blue Ford Expedition.

Two days later, on January 9, 2012, McKenzie Miller woke up at 6:00a.m. to get ready for work. She took her dog out for a walk in the area of her townhouse at the Cascade Apartment complex in Ross Township while her fiancé tried to sleep for a few more minutes. When she returned to the house, fiancé's alarm clock and iPod alarm were

going off, and she ran upstairs to turn them off so the noise would not wake their four-month-old baby who was asleep in her nursery. When Miller entered the bedroom, she saw her fiancé Joshua Scott on the floor, bound and unable to move. A man wearing a dark hooded sweatshirt, jeans, boots and a ski mask and holding a gun told her in a calm voice that as long as she did what he said, he was not going to hurt her. He asked for money and she gave him the key to their safe and Scott gave him the passcode and the man opened the safe and took between $300 and $400 that the couple had saved. The man attempted to have Miller use tape he had brought with him but she was unable to get the roll started, and so he made her retrieve duct tape from her kitchen which he used to tie up Scott. The man took Miller into the baby's room, who by now was awake and screaming, stood between Miller and the baby and told her to undress. Once she was naked, the man bound Miller's wrists with tape, positioned Miller on her hands and knees, touched her vagina with his fingers and pulled out her tampon, throwing it on the floor in front of her. He then forcefully penetrated her anus with his penis which was painful, and then he penetrated her vagina with his penis. Once he was done, the man made Miller lie down on her stomach and taped her mouth and her ankles. He then made Miller hop back into the bedroom naked and lie down on the ground next to her fiancée. He took her engagement ring which she had just received on Christmas Day, along with $20 from the couple's dresser and their cell phones and left the townhouse. After a few minutes, Miller and Scott were able to free themselves, and Miller called the police and went to the baby while Scott retrieved his gun and went to look for the man. The police responded and Miller was taken to Magee Women's Hospital, where a rape kit examination was performed.

The next morning, January 10, 2012, Ross Township Police set up a checkpoint at the entrance to the Cascades Apartment complex to canvass for witnesses and look for the dark blue Ford Expedition described by Jennifer Mamaux. The Defendant was stopped entering the complex in a dark blue Ford Expedition and told the officer that he hadn't seen anything unusual. The officer noted damage to the side of the vehicle and took down the vehicle's license plate. Further investigation by the Ross Township Police Department revealed that the vehicle was registered to the Defendant, Arthur Henderson.

Police then obtained a search warrant for the Defendant's car and residence and for a buccal swab to obtain his DNA. The Defendant's DNA was subsequently tested and was found to be a match to the samples taken from the rape kit examinations of Marilyn Early, Angela Asta and McKenzie Miller.[8]

---

[8]  See: Respondents' Exhibits at pp. 779 -785.

Petitioner's first contention is that he is entitled to relief on the grounds that the search warrant which was executed contained material misstatements. This issue was raised in Henderson's direct appeal to the Superior Court which wrote:

> [W]e have reviewed the briefs of the parties, the relevant law, the certified record before us on appeal, and the thorough opinion of the Honorable Donna Jo McDaniel… It is our conclusion that the trial court properly determined that the evidence seized should not have been suppressed…[9]

In <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976), the Court wrote "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim [applied to the states through the Fourteenth Amendment], a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial" (footnotes omitted). See also: <u>Wright v. West</u>, 505 U.S. 277 (1992)

The record clearly demonstrates that this issue was fully litigated in the trial and appellate courts and for this reason, it does not form a basis for relief here.

Petitioner's second and third issues allege that his rights were violated when the trial court and the Superior Court refused to appoint new counsel to represent him thereby forcing him to represent himself.

A criminal defendant's right to counsel is guaranteed by the Sixth Amendment and applied to the states by the Fourteenth Amendment assures that "in all criminal prosecutions, the accused shall … have the Assistance of Counsel for his defence." <u>Kansas v. Ventris</u>, 556 U.S. 586, 590 (2009).

In his Memorandum (ECF No. 2 pp. 24-25) petitioner explains that "on the day before trial, the trial court held a hearing to address petitioner's request for newly appointed counsel. It was evident throughout the hearing that petitioner desired to have trial counsel. However, as petitioner explained the substantial differences between Attorney Narvin, and himself stating that we disagree on 'absolutely everything.'" This matter was expounded upon by the Superior Court which wrote that petitioner argued "that the trial court abused its discretion by failing to appoint new trial counsel where

---

[9] Id. at p.509.

court-appointed counsel refused to subpoena critical witnesses and was allegedly unprepared for trial."[10]

The background to this issue is set forth in the Opinion of the trial court which wrote:

> [T]he Defendant argues that this Court erred in failing to grant his request for the appointment of new counsel and claims that this Court's refusal to do so forced him to proceed pro se and amounted to an unknowing, involuntary and unintelligent waiver of counsel. This claim is utterly without merit.
>
> It is well-established that "the right to appointed counsel does not include the right to counsel of the defendant's choice" … Moreover, whether to grant a defendant's petition to replace court appointed counsel is a decision which is left to the sound discretion of the trial court. As a general rule, however, a defendant must show irreconcilable differences between himself and his court appointed counsel before a trial court will be revered for abuse of discretion in refusing to appoint new counsel …
>
> Initially, it bears mention that from time of his arrest until the time of trial, the Defendant was represented by four (4) different attorneys… [three of whom] were … court-appointed attorneys…
>
> On February 4, 2013, after a jury had already been chosen, witness[es] brought in from out-of-town and the trial was scheduled to begin the next day, attorney Narvin filed a Motion to Withdraw as counsel. At a hearing on the Motion, Attorney Narvin indicated that the Defendant no longer wished for Mr. Narvin to represent him. Upon this Court's inquiry into the reasons for the Defendant's request, it was determined that the Defendant did not agree with Attorney Narvin's assessment of the case and the available defenses and that the Defendant was demanding that Attorney Narvin call various witnesses that Attorney Narvin believed would be helpful to the Commonwealth. The Defendant alleged that Attorney Narvin did not properly investigate the case, with which Mr. Narvin disagreed, citing the work he had done and the hiring of a private investigator which is borne out by the record…

An on the record colloquy ensued in which the Court cautioned the petitioner against representing himself and asked the petitioner:

> Are you going to represent yourself? Those are your two choices. You can either represent yourself and Mr. Narvin will sit with you; you

---

[10]  Id. at p.511.

> can allow Mr. Narvin to represent you, which, of course, is the only
> really good solution here; or you can have an attorney here at 9:30 in
> the morning that you have paid that is ready and prepared to go to
> trial. This case will not be postponed.

The Court then explained the pending charges and possible penalties. After again warning petitioner of the grave risks of self-representation, he clearly elected to represent himself.[11]

The record clearly demonstrates that Henderson initially had retained counsel who withdrew and subsequently three public defenders were consecutively appointed to represent him. However, a defendant can affirmatively waive his right to counsel where a waiver is knowing, voluntarily and intelligently entered. Johnson v. Zerbt, 304 U.S. 458, 464-465 (1938). After the jury had been selected and literally on the eve of trial, petitioner decided that he did not wish to be represented by his third appointed counsel. It is clearly established that a defendant does not have the right to choose a particular public defender to represent him. United States v. Gonzalez-Lopez, 548 U.S. 140 (2006).

In United States v. Kosow, 400 Fed.Appx. 698 (3d Cir. 2010), the Court wrote, "the District Court concluded that [defendant] waived his right to counsel by repeatedly hiring and firing attorneys" and, affirmed this conclusion. See also; United States v. Balsiger, 2018 WL 6441478*6 (7th Cir. 2018). As applied to the present case, it is readily apparent that the petitioner was unreasonably seeking a continuance when on the eve of trial, he requested new counsel after already having had four attorneys; that the trial court clearly questioned him about his knowledge about what was involved in the prosecution and strongly urged him to permit his current counsel to represent him or at least serve in an advisory capacity. Henderson acknowledged his understanding of his options and still elected to proceed without counsel.

Thus, the determination to have the trial proceed with or without counsel was not in violation of the laws of the United States but rather represented a determination to bar the petitioner from manipulating the system and does not provide a basis for relief here.

Henderson's final claim is that his right to self-representation was violated when while proceeding pro se he was forced to remain seated at counsel table. When raised in the trial court, the latter wrote:

> Reference to the record reveals that the Defendant used his cross-
> examinations of the victims in a most heinous fashion to further

---

[11] Id. at pp. 235-243.

psychologically intimidate and victimize the women. He made the
already fragile women tell him they were afraid of him and that they
were scared. He made Marilyn Early describe how she was hurt by
the rape. He made Angela Asta and McKenzie Miller deny that they
had met before, perhaps to imply that the rapes were consensual. He
made McKenzie Miller deny that he had been a guest in her house
before and that Joshua Scott was physically and mentally abusive to
her. And in perhaps the most offensive exchange of all, he made
Joshua Scott deny that he (Scott) had paid the Defendant money to
have a threesome with McKenzie…

The record reflects that the Defendant used his cross-examination of
the victims to further the effects of his psychological torture. This
Court was not about to let him also approach the witnesses physically
which would only have intensified the degradation of the victim's
being cross-examined by their rapist.

Moreover, as this Court noted on the record, the Sheriffs, who are
responsible for guarding defendants during trial, advised this Court
that they were uncomfortable with the security risks posed should the
Defendant be permitted to walk about the Courtroom during trial…

Given the circumstances of this case, this Court was well within its
discretion in requiring the Defendant to remain seated during the
trial.[12]

In Holbrook v. Flynn, 475 U.S. 560, 572 (1986), the Court wrote "all a federal court may
do in [reviewing a similar state habeas corpus claim] is look at the scene presented to jurors and
determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat
to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial
and if the defendant fails to show actual prejudice, the inquiry is over." "Trial judges must have
wide discretion in maintaining courtroom security." United States v. Scarfo, 850 F.2d 1015, 1024
(3rd Cir.1988). Similarly, in Pennsylvania "proper security measures are within the sound
discretion of the trial court…" Commonwealth v. Patterson, 180A.3d 1217,1225 (Pa. Super.
2016).

Clearly, under the circumstances of this case, requiring the petitioner who was
representing himself to remain seated during trial was not inherently prejudicial but rather

---

[12] Id. at pp. 244-246 (record references omitted).

invoked by the trial court to maintain courtroom security. As a result, this claim likewise does not provide a basis for relief here.

Because the record demonstrates that the petitioner's conviction was not secured in any manner contrary to decisions of the United States Supreme Court, nor involved any improper application of those determinations, he is not entitled to relief here. For this reason, the petition of Arthur Lamont Henderson for a writ of habeas corpus will be dismissed, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

An appropriate Order will be entered.

ORDER

AND NOW, this 2nd day of January, 2019, for the reasons set forth in the foregoing Memorandum Opinion, the petition of Arthur Lamont Henderson for a writ of habeas corpus (ECF No. 1) is DISMISSED and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability is DENIED.

Pursuant to Rule 4(a), F.R.App.P. petitioner is advised that if he desires to appeal this determination he must file a notice of appeal with the Clerk of this Court within thirty (30) days of this date.

s/ Robert C. Mitchell
United States Magistrate Judge